RENDERED:  MAY 26, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0847-MR

4588, LLC                                                           APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.        HONORABLE KIMBERLY N. BUNNELL, JUDGE
ACTION NO. 22-CI-00045

LEX ALEXANDRIA HOLDINGS, LLC
AND NATIONAL TITLE COMPANY                         APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; KAREM AND McNEILL, JUDGES.

KAREM, JUDGE:  4588, LLC ("4588") appeals from the Fayette Circuit Court's

orders granting a declaration of rights, summary judgment, and attorney's fees to

Lex Alexandria Holdings, LLC ("LAH").  At issue is whether the trial court

correctly determined that 4588 is required to pay earnest money as liquidated

damages to LAH after terminating a real estate purchase contract. Upon careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 6, 2021, 4588 entered into a Purchase and Sale Agreement ("the Agreement") to buy the Crystal Garden Apartments ("the Property"), located in Lexington, Kentucky, from LAH. The Agreement designated Matthew Snyder as the broker for the sale and National Title Company ("NTC") as the escrow agent. The closing date was scheduled for July 5, 2021.

Under the terms of the Agreement, the sale price of the property was $7.48 million. The Agreement required 4588 to deposit $50,000 with NTC as Earnest Money to be credited against the purchase price of the Property upon the closing of the transaction. If 4588 failed to complete the purchase or otherwise defaulted on its obligations under the Agreement, LAH was entitled to receive the Earnest Money as liquidated damages. 4588 did in fact deposit the $50,000 Earnest Money with NTC.

The Agreement provided 4588 with the right to conduct a due diligence investigation of the Property until the Due Diligence Date of May 6, 2021.[1]  4588 was given until 5:00 p.m. on that date to:

---

[1] The Agreement specified that the deadline was thirty days after the effective date, which was April 6, 2021, the date the Agreement was executed.

(i) obtain and review a soil analysis of the Property; (ii) obtain and review reports, perform analyses, and otherwise inspect the Property related to the existence of Hazardous Substances . . . and compliance with Environmental laws; (iii) obtain and review such drawings, feasibility or market studies, site plans, construction or grading plans and specifications as Purchaser may commission; **(iv) confirm that the Property is in a physical, mechanical and structural condition acceptable to Purchaser; (v) inspect the Property for building code violations**; . . . (vii) perform such other inspections, tests or studies as Purchaser deems appropriate.

(Emphasis supplied.)

If at any time prior to 5:00 p.m. on that date 4588 was "not satisfied, in its sole discretion" with the results of its investigation, it had the option of delivering notice to LAH that it had decided not to purchase the Property and it was thereafter "entitled to the immediate return of the Earnest Money."

The Agreement further provided that it could be "amended, modified or superseded only by a written instrument signed by all of the parties" and that "[n]o party shall be deemed to have waived compliance by another party of any provision of this Agreement unless such waiver is contained in a written instrument signed by the waiving party[.]"

On May 14, 2021, after the Due Diligence Date had passed, Snyder, 4588's property broker, emailed a Property Condition Assessment Report ("PCA Report") on the Property to Ed Babenco, a member of LAH. The report, which

-3-

was dated May 6, 2021, was prepared by Criterium Engineers for Shlomi Fatal, 4588's Construction Manager. It was based in part on a walk-through of the Property performed on April 19-20, 2021. The Report stated that there were numerous roof leaks and water entry issues at the Property, with water intrusion at several of the units, roof leakage at the ceiling of at least one unit and mold on walls within the units. LAH subsequently placed tarps over the areas of water intrusion.

Upon the release of the PCA Report, LAH and 4588 negotiated a reduction of the purchase price of the Property by $75,000 and an extension of the closing date to September 6, 2021. These terms were memorialized in the First Amendment to the Agreement, dated June 8, 2021. The First Amendment stated that "[t]he Purchaser acknowledges that the Due Diligence Date in section 3.2.1 of the Agreement has passed, and that the Purchaser has not terminated the Agreement." It further provided that "[e]xcept as amended herein, the Agreement and all terms and provisions thereof remain in full force and effect." Although it is not expressly stated in the First Amendment, the parties do not dispute that the price reduction and extension of the closing date were in exchange for 4588's acceptance of the Property in its "as-is" condition.

The Agreement was amended on two more occasions. On August 25, 2021, LAH and 4588 entered into a Second Amendment to the Agreement, in

which 4588 agreed to deposit an additional $100,000 with NTC as additional Earnest Money, bringing the total Earnest Money amount to $150,000. The Second Amendment provided that:

> the entire Earnest Money Deposit shall be applied to the Purchase Price at Closing, but shall be non-refundable to Purchaser and shall be released to Seller in the event Purchaser does not close on the purchase of the Property in accordance with the Agreement for any reason other than a default by Seller.
>
> The Purchaser acknowledges that the Due Diligence Date in section 3.2.1. of the Agreement has passed, the financing contingency contained in section 3.3 of the Agreement has passed, the Financing Contingency Date and Extended Financing Contingency Date in section 3.3 of the Agreement have also passed and that Purchaser has not terminated the Agreement.

4588 did not, however, deposit the additional $100,000 with NTC.

On September 20, 2021, LAH and 4588 entered into a Third Amendment to the Agreement. The Third Amendment ratified the First and Second Amendments and extended the closing date to December 4, 2021. In exchange for the extension of the closing date, 4588 agreed to deposit another $100,000 as additional Earnest Money with NTC. 4588 did deposit the $100,000. Under the terms of the Agreement and the three Amendments, the total Earnest Money required was now $250,000, of which 4588 deposited a total of $150,000 with NTC. The Third Amendment contained identical language to the Second Amendment regarding the passing of the Due Diligence Date.

-5-

On October 5, 2021, approximately two months before the new closing date, the Division of Code Enforcement of the Lexington-Fayette Urban County Government issued a Notice of Violation for the Property, finding that it required (1) electrical repair, (2) replacement of broken or missing face plates, (3) carpet cleaning, (4) HVAC maintenance and repair, and (5) replacement of roof covering that was leaking, rotted, worn, missing or otherwise deteriorated, and repair and/or removal of plaster and drywall that was damaged or moldy.

4588 did not complete its purchase of the Property on December 4, 2021, the closing date specified in the Third Amendment. Two days later, LAH received a letter from 4588 terminating the Agreement. The letter did not state a reason for the termination. According to a series of emails between Babenco and Snyder, which were placed in the record by LAH, the sale fell through because 4588 was unable to obtain financing for the purchase.

On January 5, 2022, LAH filed a complaint for declaration of rights and other relief against 4588 and NTC, seeking to recover the $150,000 in Earnest Money NTC was holding in escrow and the additional $100,000 4588 had agreed but failed to deposit with NTC pursuant to the Second Amendment. On April 12, 2022, LAH filed a motion for declaration of rights as to escrowed Earnest Money and for summary judgment as to non-escrowed Earnest Money.

On May 4, 2022, 4588 filed an opposition to the motion for declaration of rights and for summary judgment with a supporting affidavit of Fatal, its construction manager. According to his affidavit, Fatal visited the Property on multiple occasions from April 5, 2021, to December 6, 2021, for purposes of evaluating the structures and planning renovations. During his visits, he observed at least six separate holes/leaks in the roofs which were covered with plastic tarps. He reported that the tarps were present for more than 45 days and that they were ineffective at preventing water intrusion, resulting in substantial damage to the structures, including mold infestation.

4588 argued that during the period between April 6, 2021, the effective date of the Agreement, and the closing date of December 4, 2021, LAH abandoned all responsibility for the maintenance and upkeep of the Property, including the multiple holes in the roof which allowed water intrusion and the development of mold. As evidence, 4588 cited Fatal's affidavit and the Notice of Violation. It argued that because LAH had breached several provisions of the Agreement, as evidenced by the water intrusion and resultant damage of the Property, 4588 was not obligated under the express terms of the Agreement to pay the Earnest Money. It relied on several provisions of the Agreement found in Sections 4 and 5 which relate to the physical condition of the Property. They provide in pertinent part as follows:

Section 5.2 states:

Between the Effective Date [April 6, 2021] and the Closing, the Seller will continue to operate the Property in accordance with present standards. Seller will make and continue to make or cause to be made in and about the Property all repairs, restoration, replacements, and maintenance between the date hereof and the Closing Date which may be necessary to maintain the Property in as good condition as exists as of the date hereof, whether such repairs, restorations, replacements, and maintenance are ordinary or extraordinary.

Section 5.3 states:

In addition to any other conditions in this Agreement, Purchaser's obligation to close hereunder is subject to each and all of the following conditions precedent:

5.3.1 All of Seller's representations and warranties contained in Section 4 and elsewhere in this Agreement will be true and correct when made and also as of Closing.

5.3.3 There will have been no material adverse change with respect to the ownership or operation or financial or physical condition of the Property or any part thereof since the Effective Date, other than ordinary wear and tear resulting from the operation of the Property in the ordinary course of business.

5.3.4 All covenants and agreements of Seller herein will have been duly performed and satisfied.

If Seller has not satisfied any one or more of the conditions precedent contained in Sections 5.3.1 through 5.3.4, on or before Closing, Purchaser may elect to terminate this Agreement whereupon the parties will

have no further obligations pursuant to this Agreement, and the Earnest Money will be immediately returned to the Purchaser.

The representations and warranties alluded to in Section 5.3.1 provide in pertinent part:

4.3 Seller has not received from any governmental authority, any notice of zoning, building, fire, health code or other violations or proposed changes with respect to the Property, or any part thereof, that will not be disclosed to Purchaser in writing as part of the Seller Documents and that will not have been corrected prior to Closing solely at Seller's expense.

. . . .

4.5 Seller has received no notice that it is in default in respect of any of its obligations or liabilities pertaining to the Property, and, to the best of Seller's actual knowledge, there is not any existing state of facts or circumstances or condition or event which would constitute or result in any such default.

. . . .

4.11 The Property is, to the best of Seller's knowledge, in full compliance with all applicable laws and regulations, including Environmental Laws and building and health codes.

The trial court conducted a hearing on the matter on May 20, 2021, at which it focused on the significance of the "as-is" agreement underlying the First Amendment. The trial court pointed out that both parties knew about the condition of the roof, and that 4588 knew it was buying the Property "as-is." As to the

Notice of Violation, the trial court observed that 4588 already received a price reduction for the items underlying the Code violations relating to the water intrusion. 4588 argued that issues of material fact remained as to whether LAH tried to prevent the roof damage from worsening.

On June 3, 2022, the trial court entered an order ruling that LAH was entitled to recover the $150,000 deposited in the NTC account and was also entitled to recover the remaining $100,000 that 4588 was supposed to deposit in the escrow account under the terms of the Second Amendment. Upon subsequent motion by LAH, the trial court entered a separate order awarding attorney's fees to LAH in the amount of $22,449. This appeal by 4588 followed.

## **STANDARD OF REVIEW**

In reviewing a grant of summary judgment, our inquiry focuses on "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); Kentucky Rules of Civil Procedure ("CR") 56.03. The trial court is required to view the record "in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). On the other hand, "a party opposing a properly supported summary judgment motion cannot defeat it without

-10-

presenting at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482. Summary judgment "expedite[s] the disposition of cases and avoid[s] unnecessary trials when no genuine issues of material fact are raised[.]" *Id.* at 480 (citations omitted). "An appellate court need not defer to the trial court's decision on summary judgment and will review the issue *de novo* because only legal questions and no factual findings are involved." *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 705 (Ky. App. 2004).

## **ANALYSIS**

4588 argues that LAH did not satisfy conditions precedent contained in Section 5.3 of the Agreement as well as the representations and warranties of Section 4, and consequently the Agreement itself was not enforceable.

A condition precedent is defined as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 785 (Ky. 2017) (citations omitted). "Kentucky law clearly holds that if a condition precedent is not satisfied, the contract in question is not enforceable." *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky.), *aff'd*, 233 B.R. 739 (W.D. Ky. 1998).

As a preliminary matter, 4588 argues that LAH was required to plead that it had satisfied the conditions precedent in the Agreement before demanding

performance by 4588, and that by failing to do so, it was not entitled to a summary judgment in its favor.  CR 9.03 provides that "[i]n pleading the performance or occurrence of conditions precedent, it is sufficient to aver generally that all conditions precedent have been performed or have occurred.  A denial of performance or occurrence shall be made specifically and with particularity."  The performance of a condition precedent to a right of action "must be stated, or a waiver pleaded, or excuse given for noncompliance."  *Louisville & N.R. Co. v. Home Fruit & Produce Co.*, 310 Ky. 269, 273, 220 S.W.2d 558, 560 (1949).  Because LAH's complaint did not aver that all conditions precedent had been met or plead a waiver or an excuse, 4588 argues that it was deficient and failed to state a viable cause of action.

This purported error is not preserved for appellate review because 4588 never challenged the adequacy of LAH's pleadings on this basis before the trial court, either in its written responses or at the hearing.  "The Court of Appeals is without authority to review issues not raised in or decided by the trial court."  *Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989).  "[A]n appellant preserves for appellate review only those issues fairly brought to the attention of the trial court. . . .  A new theory of error cannot be raised for the first time on appeal."  *Elery v. Commonwealth*, 368 S.W.3d 78, 97-98 (Ky. 2012) (internal quotation marks and citations omitted).

In any event, the complaint was sufficient to provide 4588 with notice of the basis of the legal action against it. "Kentucky is a notice pleading jurisdiction, where the central purpose of pleadings remains notice of claims and defenses." *Pete v. Anderson*, 413 S.W.3d 291, 301 (Ky. 2013) (internal quotation marks and citations omitted). CR 8.01 "requires pleadings to contain 'a short and plain statement of the claim showing that the pleader is entitled to relief . . . .' It is not necessary to state a claim with technical precision under this rule, as long as a complaint gives a defendant fair notice and identifies the claim." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005). There is no indication that 4588 was deprived of notice or unable to identify the nature of LAH's claim.

For its substantive allegations, 4588 contends that its obligation to complete the purchase of the Property was contingent upon the satisfaction of each and every condition precedent set forth in Section 5.3. It contends that Fatal's affidavit and the Notice of Violation show that the representations and warranties made by LAH to 4588 were false and/or inaccurate and that LAH had failed to satisfy the conditions precedent to maintain the property in as good a condition as of the Effective Date until Closing. Although it acknowledges that it agreed to purchase the Property "as-is" when negotiating the First Amendment, 4588 argues that this agreement is irrelevant due to the provision which specifies that any

-13-

change in the Agreement, including the waiver of any conditions, must be in writing.

The Agreement specifically provided that 4588 had until the Due Diligence Date to "confirm that the Property is in a physical, mechanical and structural condition acceptable to Purchaser[,]" and to "inspect the Property for building code violations[.]" It was within 4588's discretion thereafter, if it was not satisfied, to "deliver notice to Seller stating that Purchaser has decided not to purchase the Property[.]" 4588 did not deliver such a Termination Notice. Therefore, by the express terms of the Agreement, 4588 confirmed that as of the Due Diligence Date, May 6, 2021, the Property was in a physical, mechanical, and structural condition acceptable to 4588. The PCA Report and 4588's own admissions confirm that 4588 was aware of the leaking roofs and resultant damage before the passing of the Due Diligence Date. Its knowledge is further evidenced by its negotiation of a reduction in price and an extension of the closing date as a result.

As stated above, Section 5.2 provides that between the Effective Date of April 6, 2021, and the Closing, LAH was to "continue to operate the property in accordance with present Standards" and "to maintain the Property in as good condition as exists as the date hereof[.]" Section 5.3.3 provides the condition precedent that "[t]here will have been no material adverse change with respect to

-14-

the ownership or operation or the financial or physical condition of the Property or any thereof since the Effective Date; other than ordinary wear and tear resulting from the operation of the Property in the ordinary course of business." Therefore, LAH was only required to maintain the Property in as good a condition as existed on April 6, 2021. 4588 had a month thereafter within which to confirm that the condition of the Property was acceptable, which it did.

There is no evidence that the condition of the roof worsened after May 6, 2021. Fatal's affidavit describes the damage caused by the water intrusion but does not provide any dates to indicate that he observed a worsening of that condition over time. As to the violations unrelated to the roof which were reported in the Notice of Violation, relating to the electrical system, carpeting, and HVAC, there is no evidence they constituted anything beyond normal wear and tear.

According to Babenco's affidavit, the violations found in the Notice of Violation were the same issues identified in the PCA Report, which 4588 agreed to resolve through a price reduction. The affidavit states that "such code violations are routine with any multi-family property such as the Property, and even the October 5, 2021 Notice of Violation, . . . referred to the cited violations as 'Routine.'" The affidavit further states that "[s]uch code violations are remedied in the ordinary course of business and, in fact, LAH had scheduled repairs of the

issues underlying the October 5, 2021 Notice of Violation prior to receiving 4588's December 6, 2021 termination letter."

The Agreement provided 4588 with thirty days, from the Effective Date until the Due Diligence Date, within which to determine whether the Property was in an acceptable condition. During that period, it is undisputed that 4588 was made aware of the roof issues and even subsequently negotiated a price reduction on that basis. Under the terms of the Agreement, once the Due Diligence date had passed, 4588 confirmed that the physical, mechanical, and structural condition of the Property was acceptable as it stood on that date.

As to LAH's duty under the Agreement to continue to maintain and repair the property until the Closing Date, 4588 provided no material evidence that there was any worsening or deterioration of the condition of the Property relating to the leaky roofs after the Due Diligence Date. As to the other violations found in the Notice of Violation, relating to the electrical system, carpeting, and HVAC, 4588 provides no evidence to contradict the assertion in Babenco's affidavit that LAH was prepared to remedy them in accordance with Section 5.2 of the Agreement.

## CONCLUSION

For the foregoing reasons, the judgment and order of the Fayette Circuit Court ruling that LAH was entitled to recover all the Earnest Money under

-16-

the Agreement, consisting of $100,000 of non-escrowed Earnest Money and $150,000 being held in escrow by NTC, plus post-judgment interest, is affirmed. 4588 has also appealed from the trial court's order granting attorney's fees to LAH. It has raised no arguments regarding the award of attorney's fees and therefore that order is also affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Zachary Gottesman
Cincinnati, Ohio

BRIEF FOR APPELLEE LEX ALEXANDRIA HOLDINGS, LLC:

J. Wesley Harned
Lexington, Kentucky